

U.S. Department of Justice

*United States Attorney
District of New Jersey*

_____

*970 Broad Street, 7th floor*　　　　　　　　　　　　　　　*973-645-2700*
*Newark, New Jersey 07102*

May 21, 2020

**Filed Via ECF**
The Honorable Claire C. Cecchi
United States District Judge
Martin Luther King, Jr.
Federal Building & Courthouse
50 Walnut Street
Newark, New Jersey 07102

　　　　　　Re:　*United States v. Dianthe Martinez-Brooks,*
　　　　　　　　　18-cr-038 (CCC)

Dear Judge Cecchi:

　　Defendant Dianthe Martinez-Brooks ("defendant") has moved for compassionate release under 18 U.S.C. § 3582(c)(1)(A) in light of the current COVID-19 pandemic. Defendant asks the Court for immediate release, and alternatively, a sentence modification to home confinement, citing recent memoranda promulgated by the Attorney General that address BOP measures to protect against COVID-19. (*See* Docket Entry ("DE") 32).

　　Defendant contends that due to her medical history of lupus and chronic asthma, she is at a high risk of infection and severe complications from COVID-19. (*Id.*). The Centers for Disease Control ("CDC") has identified risk factors that place individuals at higher risk of severe outcomes from COVID-19, such as moderate to severe Asthma. Accordingly, the Government acknowledges that during the COVID-19 pandemic, defendant's documented medical history of chronic Asthma presents an extraordinary and compelling reason allowing compassionate release under § 3582(c)(1)(A) and the Sentencing Commission guideline policy statement. Defendant, however, is not entitled to the extraordinary relief of compassionate release because defendant has failed to establish that her risk of contracting COVID-19 during continued detention at FCI Danbury is greater than the risk she would face at her proposed release location. Additionally, defendant has failed to proposed a verifiable release plan that comports with the assessment factors used by the BOP to determine home confinement eligibility. Moreover, compassionate

release in this instance would eliminate nearly 26 months from defendant's original 48-month sentence, which not only in itself represented a downward variance from the original 57-71 month range defendant faced at sentencing, but also represented Chief Judge Jose L. Linares's balancing of all the § 3553(a) factors such as the severity of the significant fraud and corruption offense to which defendant pleaded guilty and the need for general deterrence.

Moreover, while defendant conflates her motion for compassionate release with a request to be released on home confinement, those two avenues of relief are wholly distinct; BOP exclusively controls decisions of home confinement, and this Court lacks authority to consider that request. For these reasons, the Court should reject defendant's petitions.

**I.   Background**

    **A.   Offense Conduct, Conviction, Sentence, and Appeal**

Defendant's offense conduct involved her role in a corrupt and fraudulent scheme to steal money from the Newark Watershed Conservation and Development Corporation ("NWCDC). (*See* Presentence Investigative Report ("PSR) at ¶22-35). The City of Newark delegated to the NWCDC responsibility for operating the city's water assets and transmitting clean drinking water to the city through several service contracts. (*Id.*). Almost all of the funding for the NWCDC came from taxpayers of the City of Newark and surrounding townships.

Defendant was closely associated with Donald Bernard Sr. who worked as a consultant and then an employee of the NWCDC and used his position to select and recommend for hiring certain contractors with whom Bernard had arranged to receive secret kickbacks in exchange for his assistance in obtaining fraudulent contracts and payments for them. (PSR at ¶ 45-55). Bernard and the Executive Director, Linda Brashear, shared in these corrupt kickbacks, typically funded by fraudulent payments that the contractors had obtained from the NWCDC with Bernard's and Brashear's help. (*Id.*).

Through her relationship with Bernard, defendant was hired as a political consultant through her company, DMart127, which facilitated the above-described scheme by presenting inflated invoices to the NWCDC for payment, which payments were shared with Bernard and Brashear. (PSR at ¶¶ 101-106). Not only did defendant engage in the scheme through her own company, but also she took part in recruiting other companies to feed the corrupt and fraudulent scheme. Defendant introduced a consulting business that was owned by her relative to submit false and fraudulent invoices that detailed services that were never rendered. (Id.). Payments to defendant's relative's company were shared among defendant, Bernard, and Brashear. Defendant also recruited the companies of another defendant, Kevin Gleaton,

who also provided a stream of payments shared among defendant, Bernard and Brashear through the payments received by his companies for the false and fraudulent invoices that Gleaton submitted to the NWCDC for payment. (Id.).

Pursuant to a plea agreement with the United States, on January 29, 2018, defendant appeared before Chief U.S. District Judge Jose L. Linares, and pleaded guilty to an information that charged her with transmitting and causing the transmission in interstate commerce by means of wire, radio, and television communications certain writings, signs, signals, pictures, and sounds, for the purpose of executing and attempting to execute a scheme and artifice to defraud and to obtain money and property from the NWCDC. (PSR at ¶ 20).

On September 18, 2018, defendant appeared before Chief Judge Linares for sentencing. At the start of the hearing, defendant faced an advisory Guidelines offense level of 25, which equated to 57-71 months' imprisonment. After hearing from both parties, Chief Judge Linares varied downward slightly and imposed a sentence of 48 months in prison due to the severity of the fraud and corruption that took place at the NWCDC. The sentence reflected a balancing of the § 3553(a) factors that weighed defendant's family circumstances and good deeds argued by her attorney against the severity of the fraud and corruption that took place at the NWCDC and a need for general deterrence to prevent others from committing such crimes, as argued by the Government. Defendant was also sentenced to 3 years of supervised release, restitution of $226,666, joint and several with Bernard, Brashear and Gleaton, and forfeiture of $37,033. (*See* DE14).

Contrary to the terms of the plea agreement with the United States, on or about October 2, 2018, defendant filed a motion challenging the sentence imposed by the Court and moved to amend the sentence under Rule 35. (*See* DE16). Defendant disagreed with the Court's findings at sentencing that the NWCDC was a public entity and that Linda Brashear was a public official, which exposed defendant to a higher Guidelines offense level. (*See Id.*). On December 14, 2018, Chief Judge Linares denied the motion, citing defendant's untimely filing, the appellate waiver in the plea agreement, and the lack of merit in defendant's argument. (*See* DE26).

Shortly thereafter, on December 16, 2018, defendant filed a notice of appeal with the Third Circuit Court of Appeals premised, in large part, on the same argument she made in her motion to correct her sentence. (*See* DE27). The Third Circuit affirmed the District Court, relying on the enforceability of the appellate waiver in the plea agreement. (*See* DE30).

On or about January 31, 2019, defendant began serving her term of imprisonment at FCI Danbury in Danbury, Connecticut. (*See* DE25). To date,

defendant has served approximately 15 months of her 48-month sentence and has a projected release date of June 25, 2022.

    **B.**    **BOP's Response to the COVID-19 Pandemic**

   1. <u>Preventative Measures taken at BOP Facilities Nationally</u>

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy. In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, *Updates to BOP COVID-19 Action Plan: Inmate Movement* (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19 _update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, *Pandemic Influenza Plan-Module 1: Surveillance and Infection Control* (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id.* at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities. Since that time, as events have required, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations. The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease. Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access. Further, BOP has severely limited the movement of inmates and detainees among its facilities. Though there will be exceptions for medical treatment and similar exigencies, this step will limit transmissions of the disease. Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and are strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

The BOP also has taken steps to monitor its inmate population and further safeguard it. Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms. Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation. In addition, in areas with sustained community transmission, all facility staff are screened for symptoms. Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone. A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Social and legal visits were stopped as of March 13, and remain suspended, to limit the number of people entering the facility and interacting with inmates. Tours of facilities also have been suspended. Legal visits are permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution. BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead. But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations. For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the citizenry. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once

released (at a time that the Probation Office has necessarily cut back on home visits and supervision).

2. <u>The Attorney General's Memorandum for the Director of the BOP, dated March 26, 2020</u>

On March 26, 2020, the Attorney General of the United States issued a Memorandum for the Director of the Bureau of Prisons (the March 26, 2020 Memorandum) to ensure that, in light of the COVID-19 pandemic, BOP utilizes home confinement, where appropriate, to protect the health and safety of BOP personnel and people in BOP's custody. Pursuant to the March 26, 2020 Memorandum, BOP is prioritizing the use of its statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic. It was noted in the March 26, 2020 Memorandum that many inmates will be safer in BOP facilities where the population is controlled and there is ready access to doctors and medical care. But for some eligible inmates, home confinement might be more effective in protecting their health.

In assessing whether home confinement should be granted pursuant to the March 26, 2020 Memorandum, the BOP considers the totality of circumstances for each individual inmate, the statutory requirements for home confinement, and the following non-exhaustive list of discretionary factors:

   a. The age and vulnerability of the inmate to COVID-19, in accordance with the CDC guidelines;

   b. The security level of the facility currently holding the inmate, with priority given to inmates residing in low and minimum security facilities;

   c. The inmate's conduct in prison, with inmates who have engaged in violent or gang-related activity in prison or who have incurred a BOP violation within the last year not receiving priority treatment;

   d. The inmate's score under PATTERN (the Prisoner Assessment Tool Targeting Estimated Risk and Need),[1] with inmates who have anything above a minimum score not receiving priority treatment;

   e. Whether the inmate has a demonstrated and verifiable re-entry plan that will prevent recidivism and maximize public safety, including verification that the conditions under which the inmate would be confined upon release would present a lower risk of

---

[1] For more information on PATTERN, please visit www.bop.gov via Inmates/ First Step Act tab.

      contracting COVID-19 than the inmate would face in his or her BOP facility;

  f.  The inmate's crime of conviction, and assessment of the danger posed by the inmate to the community. Some offenses, such as sex offenses, are likely to render an inmate ineligible for home confinement. Other serious offenses weigh heavily against consideration for home confinement.

In addition to setting forth these factors, the March 26, 2020 Memorandum stated that before granting any inmate discretionary release, the BOP Medical Director, or someone he designates, will, based on CDC guidance, make an assessment of the inmate's risk factors for severe COVID-19 illness, risks of COVID-19 at the inmate's prison facility, as well as the risk of COVID-19 at the location in which the inmate seeks home confinement. The BOP will not grant home confinement to inmates when doing so is likely to increase their risk of contracting COVID-19. The BOP will grant home confinement only when it has determined -- based on the totality of circumstances for each individual inmate -- that transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19.

Moreover, the March 26, 2020 Memorandum noted that for the protection of the public, any inmate to whom BOP grants home confinement is to be placed in a mandatory 14-day quarantine before that inmate is discharged from a BOP facility to home confinement. Inmates transferred to home confinement under this prioritized process are also subject to location monitoring devices and, where a court order is entered, are subject to supervised release.

3. <u>The CARES Act and the Attorney General's Memorandum for the Director of the BOP, dated April 3, 2020</u>

The Coronavirus Aid, Relief, and Economic Security (CARES) Act, Public Law No. 116-236 (enacted March 27, 2020), authorized the Attorney General to expand the cohort of inmates who can be considered for home confinement upon his finding of emergency conditions which are materially affecting the function of the BOP. On April 3, 2020, the Attorney General made that finding, and in a Memorandum for the Director of the BOP (April 3, 2020 Memorandum), authorized the Director to immediately maximize appropriate transfers to home confinement of all appropriate inmates held at BOP facilities where the Director determined that COVID-19 was materially affecting operations.

The April 3, 2020 Memorandum specifically stated that the BOP must move with dispatch in using home confinement, where appropriate, to move

vulnerable inmates out of FCI Oakdale, FCI Danbury, and FCI Elkton, and to give priority to those institutions, and others similarly affected, as the BOP continues to process the remaining inmates who were for home confinement under pre-CARES Act standards.

The April 3, 2020 Memorandum directed that the BOP give priority in implementing the new standards to the most vulnerable inmates at the most affected facilities and was explicit that the BOP should begin implementing this directive immediately at the identified facilities and any other facilities at risk of similar problems. The April 3, 2020 Memorandum stated that the review should include a much broader pool of at-risk inmates—not only those who were eligible for transfer prior to the Attorney General exercising his authority under the CARES Act. The assessment of all inmates remains guided by the factors in the March 26, 2020 Memorandum.

For inmates deemed suitable candidates for home confinement, the April 3, 2020 Memorandum directed the BOP to immediately process these inmates for transfer and then immediately transfer them following a 14-day quarantine at an appropriate BOP facility. The April 3, 2020 Memorandum further authorized BOP to, in appropriate cases, require that the inmate being transferred undergo his or her 14-day quarantine in the residence to which the inmate was being transferred rather than in the BOP facility from which the inmate was being transferred.

The April 3, 2020 Memorandum also recognized that the BOP has limited resources to monitor inmates on home confinement and that the U.S. Probation Office is unable to monitor large number of inmates in the community, and authorized the BOP to transfer inmates to home confinement even if electronic monitoring is not available, so long as it determines in every instance that doing so is appropriate and consistent with the obligation to protect public safety.

Lastly, the April 3, 2020 Memorandum stated that it was essential for the BOP to continue making determinations for home confinement in a careful and individualized way that remains faithful to the duty of protecting the public and law enforcement officers.

4. The BOP's Implementation of the March 26, 2020 and the April 3, 2020 Memoranda

The BOP is devoting all available resources to executing the Attorney General's directives, with such resources tailored and prioritized according to the needs of individual institutions across the country. The BOP is assessing the inmate population to determine which inmates would be appropriate for

transfer under this priority program.  The BOP is then processing those inmates for transfer as expeditiously as possible.

The BOP is also frequently updating its public website to provide information and responses to frequently asked questions regarding its response to the COVID-19 pandemic, including providing information regarding its implementation of the Attorney General's directives.

The BOP has increased home confinement by over 103% since March 2020, and is continuing to aggressively screen inmates for home confinement. Since the March 26, 2020 Memorandum instructing the BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the BOP has placed an additional 2,932 inmates on home confinement.  See www.bop.gov.

Inmates do not need to apply to be considered for home confinement. BOP Case Management staff are urgently reviewing all inmates to determine which ones meet the criteria established by the Attorney General.  While all inmates are being reviewed for suitability for home confinement, any inmate who believes he or she is eligible may request to be referred to home confinement and provide a release plan to his or her Case Manager.

It should be noted that for public safety reasons, in accordance with the March 26, 2020 Memorandum, and to ensure the BOP is deploying its limited resources in the most effective manner, the BOP is currently assessing a number of factors to ensure that an inmate is suitable for home confinement including, but not limited to, reviewing the inmate's institutional discipline history for the last twelve months; ensuring that the inmate has a verifiable release plan; verifying that the inmate's primary offense is not violent, a sex offense, or terrorism related; and confirming the inmate does not have a current detainer.

In addition, and in order to prioritize its limited resources, the BOP has generally prioritized for home confinement those inmates who have served a certain portion of their sentences, or who have only a relatively short amount of time remaining in those sentences.  While these priority factors are subject to deviation in BOP's discretion in certain circumstances and are subject to revision as the situation progresses, BOP is, at this time, prioritizing for consideration those inmates who either (1) have served 50% or more of their sentences, or (2) have 18 months or less remaining in their sentences and have served 25% or more of their sentences.  As BOP processes the inmates eligible for home confinement under these criteria and learns more about the COVID-19 pandemic and its effect on BOP facilities, it is assessing whether and how to otherwise prioritize consideration.

No single one of these factors will automatically disqualify an inmate for home confinement. The fact that an inmate's primary offense was violent, a sex offense, or terrorism related, or that the inmate has a current detainer, would not necessarily be disqualifying; however, BOP will not deviate from any of these four factors except in the rarest circumstances. BOP retains discretion to deviate from any factor where appropriate to maximize home confinement placements taking into account public safety and the totality of the circumstances.

As of May 13, 2020, before the BOP approves an inmate for home confinement who does not meet the criteria outlined by the Attorney General, the BOP provides notice of its consideration to the United States Attorney's Office that prosecuted the inmate so that the United States Attorney's Office is given an opportunity to provide additional information, including information from victims, which might be relevant to the decisional process. The United States Attorney's Office then has three business days to provide any additional information to the BOP. The BOP retains full discretion to make the decision with or without this input based on a flexible consideration of the criteria and the totality of the circumstances, including the risks associated with the COVID-19 virus. The notification requirement does not apply to inmates approved for home confinement prior to this requirement's adoption on May 13, 2020.

If the incarcerated individual does not qualify for home confinement under BOP criteria, an inmate may be reviewed for placement in a Residential Reentry Center and home confinement at a later stage in accordance with applicable laws and BOP policies.

   5. Current Conditions at FCI Danbury

Opened in 1940, FCI Danbury is a male, low-security level correctional institution (the "Main Complex") with an adjacent female minimum-security level federal prison camp (the "Camp") and a female federal satellite low-security level facility (the "FSL"). *See* Declaration of FCI Danbury Warden Diane Easter, filed by the United States Attorney's Office in the District of Connecticut on May 6, 2020, in *Martinez-Brooks, et al v. Easter*, Civ. No. 2020-569, attached hereto as Exhibit "A."[2] FCI Danbury is an institution that

---

[2] On or about April 27, 2020, the defendant, along with three other lead plaintiffs filed a class action suit against the Warden of FCI Danbury, and the Director of the BOP claiming, among other things, that the BOP had failed to implement measures to comply with their duty to protect the most vulnerable inmates and seeking the immediate transfer of the most medically vulnerable individuals to home confinement or other appropriate arrangements. (See

houses only sentenced offenders. *Id.* at ¶ 3.  The Main Complex is a low security facility with a double-fenced perimeter, mostly dormitory or cubicle housing, and strong work and program components.  *Id.* at ¶ 5.  The staff-to-inmate ratio at the Main Complex is higher than in the minimum security facilities.  *Id.*  As of the date of the attached declaration, the Main Complex housed 719 male offenders.  *Id.*

The Camp is a minimum security institution which has dormitory housing, a relatively low staff-to-inmate ratio, and no perimeter fencing.  *Id.* at ¶ 6.  As of the date of the attached declaration, the Camp houses 134 female offenders.  *Id.*

The FSL is a low security facility with a single-fenced perimeter, cubicle house dormitory or cubicle housing, and strong work and program components.  *Id.* at ¶ 5.   As of May 4, 2020, the FSL houses 131 female offenders.  *Id.* at ¶ 5.

The Main Complex, the Camp, and the FSL are separate facilities, and, and under the current lockdown, the inmate populations do not interact.  *Id.* at ¶ 5.  There are currently 264 staff employed at the institution.  *Id.* at ¶ 4.

FCI Danbury has implemented the BOP's national action plan, in compliance with the BOP's national directives, and has also taken numerous other measures to fight the introduction and spread of COVID-19 within its facilities including providing inmate and staff education; conducting inmate and staff screening; putting into place testing, quarantine, and isolation procedures in accordance with the BOP policy and CDC guidelines; ordering enhanced cleaning and medical supplies; and taking a number of other preventative measures.  *Id.* at ¶ 22.

Unfortunately, FCI Danbury is one of the three BOP facilities named in Attorney General Barr's April 3, 2020 memo prioritizing home confinement for eligible inmates and identifying BOP facilities experiencing significant levels of COVID-19 infections.  As of the writing of this brief, FCI Danbury reports having 34 inmates and 3 staff members that have tested positive for COVID-19.  *See* Federal Bureau of Prisons, *COVID-19 Cases*, at https://www.bop.gov/coronavirus/.  Based on the representations made to this AUSA during a telephone conversation on May 20, 2020 by Correction Officer Jessly Ramos, who is the Case Manager for defendant, to date, there have been no positive COVID-19 cases at the Camp, where defendant is located.  All reported COVID-19 cases at FCI Danbury have been isolated to the Main Complex and the FSL.

---

*Martinez-Brooks, et al v. Easter*, Civ. No. 2020-569, DE1).  That case is still pending.

In response to the class action suit against FCI Danbury by defendant and the other lead plaintiffs, the BOP has issued certain declarations with respect to the reduction in sentence and home confinement procedures in place at FCI Danbury prior to, and in response to, the March 26, 2020 Attorney General Memorandum. (*See* 20-cv-596, Ct. District Court, DE 41, 42, 43, 44, 47 and 48). The current procedure for expeditiously identifying inmates at FCI Danbury who are eligible for reduction in sentence and/or home confinement includes the creation of a list of medically vulnerable inmates who are assessed by the prison. *See* 20-cv-569, Ct. District Court, DE48). The list contains approximately 314 inmates. This AUSA confirmed with AUSA David Nelson on May 19, 2020, who represents both the BOP and FCI Danbury in the class action suit, that the defendant's name does appear on the list of medically vulnerable inmates.

As outlined in the declaration of Rose Adamson, the Reduction in Sentence Coordinator at FCI Danbury, on or about May 14, 2020, she personally gave a reduction in sentence application to each inmate on the list of medically vulnerable inmates who had not previously applied for a reduction in sentence. *See id.* Moreover, based on this AUSA's telephone conversation with Mr. Ramos, defendant's Case Manager at FCI Danbury, the defendant has been considered and denied transfer to home confinement under the CARES Act each of the approximately three times there was a change in the criteria for home confinement because she is not eligible due, in part, to the amount of her sentence that remains compared to the time that she has served.

## C.   Defendant's Prior Request to BOP for a Sentence Reduction

On March 26, 2020, defendant submitted a request for compassionate release and home confinement to the Warden of FCI Danbury. (*See* Request attached hereto as Exhibit B). The request was reduced to one sentence, "Please accept my request for compassionate release due to Covid-19 and my numerous underlying health conditions." Despite defendant indicating on the request that she would attach a detailed outline of her concerns and why she was making the request, a note at the bottom on the request states that there was nothing attached to the application. As such, the Warden had no re-entry plan for defendant which would have presented details such as who the defendant sought to live with and where, if granted a reduction in sentence or home confinement.

In a written decision dated May 7, 2020, the Warden denied defendant's request for compassionate release explaining that based on the guidance on the types of circumstances that present extraordinary or compelling reasons that warrant compassionate release, defendant's case did not warrant an early release from her sentence. (*See* Signed Denial attached hereto as Exhibit C). Additionally, the decision explained that defendant's case was reviewed for

home confinement under the CARES Act and she was found ineligible because she had not yet served 50% of her sentence and she had greater than 18 months remaining on her sentence. (*Id.*)  The decision also stated that BOP was taking extraordinary measures to contain the spread of COVID-19 and treat any affected inmates.  (*Id.*).

## II.     Analysis

### A.     Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce her term of imprisonment. Before filing that motion, however, the defendant must first request that BOP file such a motion on her behalf. § 3582(c)(1)(A).  A court may grant the defendant's own motion for a reduction in her sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.*

If that exhaustion requirement is met, a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).  As the movant, the defendant bears the burden to establish that she is eligible for a sentence reduction.  *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under § 3582(c)(1)(A).  As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the § 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement." USSG § 1B1.13.[3]

---

[3] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under § 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." USSG § 1B1.13, cmt. n.1(A)(i). Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> <u>that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility</u> and from which he or she is not expected to recover.

USSG § 1B1.13, cmt. n.1(A)(ii). (*emphasis* added). The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances. USSG § 1B1.13, cmt. n.1(B)-(C). Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons." USSG § 1B1.13, cmt. n.1(D).

### B.   **Defendant Is Not Entitled To Compassionate Release.**

The Government begins its analysis with the merits of the case because, although defendant did not exhaust her administrative appeals with respect to her request for a reduction in sentence, the statutory 30-day waiting period after presenting a request to the Warden before seeking judicial relief from the Court has expired. 18 U.S.C. § 3582(c)(1)(A). The Government concedes that defendant presented a request for a reduction in sentence to the Warden of FCI Danbury on March 26, 2020 and that the present motion was filed on May 8, 2020, which is longer than the required 30-day period. That being said, defendant's motion should be denied because she fails to clear the high hurdle required to secure compassionate release.

---

"consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the policy statement applies to motions filed by defendants as well.

Defendant seeks compassionate release because her medical history of Asthma, high blood pressure, and lupus make her vulnerable to contracting COVID-19 during the pandemic while being incarcerated at FCI Danbury. (DE32 at 4-5). Defendant argues that the FCI Danbury is unable to adequately protect her against the virus and that she would be safer returning to live with her boyfriend and his sister. *Id.*

The Government is certainly sensitive to the issues defendant raises, and we do not minimize the concern or the risk. Nevertheless, defendant has not demonstrated a case that warrants compassionate release because (1) defendant has failed to establish that her risk of contracting COVID-19 during continued detention at FCI Danbury is greater than the risk she would face at her proposed release location; (2) defendant has offered no verifiable release plan, and the release plan that can be surmised from her motion weighs heavily against her release; and (3) the § 3553(a) factors weigh against compassionate release here.

In this case, defendant argues that her medical history of lupus, asthma and high blood pressure increases her vulnerability to COVID-19, particularly in a setting such as FCI Danbury, where positive cases of COVID-19 are present. DE32. Defendant contends that these circumstances qualify as extraordinary and compelling and warrant compassionate release. DE32 at 4-5. In light of the fact that the CDC has identified moderate to severe asthma as an underlying condition that places a person at high risk of severe outcomes from COVID-19, and defendant's asthma is well documented in her prison medical files, the Government acknowledges that during the current COVID-19 pandemic, the defendant has presented an extraordinary and compelling reason allowing compassionate release under the § 3582(c)(1)(A) and the Sentencing Commission's policy statement, even if asthma, during ordinary times, would not for compassionate release.[4] The analysis, however, does not end there. Defendant's motion should still be denied because of her failure to establish that (1) she would face less risk of contracting COVID-19 at her release location than at FCI Danbury, (2) she has a verifiable release plan that comports with the BOP factors for home confinement, and (3) given the § 3553(a) factors at issue during her sentencing her case warrants a reduction in sentence.

---

[4] It should be noted that a review of defendant's medical records from FCI Danbury, attached hereto as Exhibit D, reveal scant mention of lupus as a cause of complaint or problem for the defendant. In fact, defendant readily admits that she was reportedly "diagnosed with lupus in 2008, although she has been asymptomatic and is not in active treatment." PSR at ¶ 158. In fact the only mention of lupus in defendant's medical records appears in a comment by the treating physician that reads "Informed all labs to r/o RA or Lupus are negative." Exhibit D at 45

One of the factors considered by the BOP in assessing whether a reduction in sentence or home confinement should be granted pursuant to the Attorney General's March 26, 2020 memo includes a comparison between the risk of infection at FCI Danbury against the risk of infection at the location defendant plans to reside if granted home confinement. Here, defendant did not present a verifiable release plan with her request for compassionate release and home confinement to the BOP nor has she presented a detailed plan with her present motion. Her release plan here amounts to "returning to live with her boyfriend and his sister." DE32 at 5. Defendant's PSR indicates that at sentencing, she lived with her boyfriend Shenendoah "Shane" Adams since 2017 in Livingston New Jersey. (PSR ¶ 153).

If defendant's re-entry plan is to return to Livingston, New Jersey to live with Mr. Adams, then defendant's motion must fail because that re-entry plan is at odds with the enumerated factors to be considered. First, defendant's plan to return to Essex County where, as of May 20, 2020, approximately 16,952 people have tested positive for COVID-19, (Essex County Corona Virus Cases at https://essexcountynj.org/wp-content/uploads/2020/05/essex-county-coronavirus-cases-may-20.pdf), does not decrease her risk of exposure to COVID-19 as compared to Fairfield Count, Connecticut where, as of May 20, 2020, approximately 14,719 people tested positive for COVID-19. *See* COVID-19 Update May 20, 2020 at https://portal.ct.gov/-/media/Coronavirus/CTDPHCOVID19summary5202020.pdf?la=en. Second, defendant's plan to return to live with Mr. Adams runs afoul of another factor that the BOP considers in its reduction in sentence and home confinement decisions – whether the inmate has a demonstrated re-entry plan that will prevent recidivism. *See* List of factors above at pg 6. On or about February 25, 2020, Mr. Adams, was indicted for his participation in wire fraud schemes to defraud a lending institution of money and property, defraud the Orange Public Library of money and property and making false statements in connection with mortgage loans. *See* Indictment, *United States v. Shenendoah Adams*, 20-cr-194 (ES), DE1. Defendant's failure to present a re-entry plan that comports with the factors used to assess her eligibility for home confinement weighs against her current motion for compassionate release, and should cause the Court to deny her motion.

Finally, the § 3553(a) factors considered in sentencing the defendant support a denial of her motion for compassionate release. In light of the seriousness of the crime committed by defendant, the significant monetary loss suffered by the NWCDC and the citizens of the City of Newark, and the need for general deterrence in this matter, defendant received a 48-month sentence after Chief Judge Linares varied downward to account for her good deeds and family circumstances. Defendant has approximately 26 months remaining in that original sentence. Compassionate release in this case would undermine

the very reasons that Chief Judge Linares sentenced defendant to such a significant prison term. For all of these reasons defendant's motion for compassionate release should be denied.

### C. This Court Lacks Authority to Order Home Detention.

Defendant also asked this Court to alternatively order BOP to place her on home confinement for the remainder of her sentence. *See* DE32 at 6-7. That request should be denied because this Court has no authority to direct BOP to place a defendant in home confinement. Rather, such designation decisions are committed solely to BOP's discretion.

Once a sentence is imposed, BOP is solely responsible for determining an inmate's place of incarceration. *See* 18 U.S.C. § 3621(b); *Moore v. United States Att'y Gen.*, 473 F.2d 1375, 1376 (5th Cir. 1973) (*per curiam*); *see also McKune v. Lile*, 536 U.S. 24, 39 (2002) (plurality opinion) ("It is well settled that the decision where to house inmates is at the core of prison administrators' expertise."). A court has no authority to designate a prisoner's place of incarceration. *United States v. Voda*, 994 F.2d 149, 151-52 (5th Cir. 1993). Because defendant's request for home confinement alters only the place of incarceration, not the actual term of incarceration, only BOP may grant or deny his request.

Moreover, there is no constitutional or statutory authority that allows the Court to order home confinement. A prisoner has no constitutional right to confinement in any particular place, including in home confinement. *See Sandin v. Conner*, 515 U.S. 472, 478 (1995) ("the Due Process Clause did not itself create a liberty interest in prisoners to be free from intrastate prison transfers."); *Meachum v. Fano*, 427 U.S. 215, 224 (1976) ("The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in any of its prisons."). Following the imposition of sentence, the Court has limited jurisdiction to correct or modify that sentence absent specific circumstances enumerated by Congress in 18 U.S.C. § 3582. *United States v. Garcia*, 606 F.3d 209, 212 n.5 (5th Cir. 2010) (*per curiam*). Section 3582(c) contemplates only a reduction in sentence. *See* § 3582(c). But defendant's request to serve the rest of her term in home confinement, as opposed to prison, works no reduction to her sentence. Home confinement merely permits the inmate to serve out her term of imprisonment at home. Defendant's request for such relief therefore falls outside § 3582(c)'s limited grant of authority to this Court to modify a sentence post-conviction. Because § 3582(c) deprives the Court of jurisdiction to grant home confinement and because defendant offers no other statutory authority to support her request for such relief, this Court has no authority to act on her request for such relief

in this forum.[5]  Accordingly, defendant's motion to the Court to be transferred to home confinement should be denied.

---

[5] It also should be noted that in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.  On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.  That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).  Congress has also acted to enhance BOP's flexibility to respond to the pandemic.  Under the Coronavirus Aid, Relief, and Economic Security Act, enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.  Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).  On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.  As of this filing, BOP has transferred approximately 2932 inmates to home confinement.  *See* Federal Bureau of Prisons, COVID-19 Home Confinement Information, at https://www.bop.gov/coronavirus/.

## Conclusion

      For the reasons set forth above, the Government respectfully submits that defendant's motion for compassionate release should be denied because (1) defendant fails to establish that her risk of contracting COVID-19 at FCI Danbury is greater than her risk of contracting COVID-19 at her proposed place of release; (2) defendant fails to provide a verifiable re-entry plan that comports with BOP factors, and the plan surmised from the motion weighs heavily against release; and (3) in light of § 3553(a) factors taken into account at defendant's sentencing, compassionate release would undermine the very reasons defendant received such a significant prison term.
Lastly, this Court lacks authority to grant defendant's request for discretionary transfer to home confinement.  Defendant's motion should be denied.

      Respectfully submitted,

      CRAIG CARPENITO
      United States Attorney

By:   JACQUES S. Pierre
      Assistant U.S. Attorneys

cc: Paulette Pitt, Esq.